#30028-r-JMK
**2024 S.D. 18**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                           Plaintiff and Appellee,

    v.

KEATON A. VAN DER WEIDE,                       Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE RACHEL R. RASMUSSEN
Judge

\* \* \* \*

KRISTI JONES of
Dakota Law Firm, Prof. LLC
Sioux Falls, South Dakota                        Attorneys for defendant
                                         and appellant.


MARTY J. JACKLEY
Attorney General

CHELSEA WENZEL
Assistant Attorney General
Pierre, South Dakota                             Attorneys for plaintiff and
                                         appellee.

\* \* \* \*

ARGUED
OCTOBER 5, 2023
OPINION FILED **04/03/24**

#30028

KERN, Justice

[¶1.] S.O. accused Keaton Van Der Weide of raping her on June 13, 2021. Despite having a daughter together, their relationship had been sporadic, with multiple engagements and breakups. S.O. claimed that, after she arrived home early in the morning following a night out with friends, Van Der Weide sexually assaulted her, penetrating her anally and vaginally without consent. When interviewed, Van Der Weide told police that the sexual encounter was consensual and involved the use of multiple sex toys, which were taken into evidence. S.O. maintained that she was not penetrated with a toy and only threw one at Van Der Weide after grabbing it away from him during the attack. Van Der Weide was charged with second-degree rape in violation of SDCL 22-22-1(2).

[¶2.] Before trial, Van Der Weide moved to introduce evidence of the sex toys, including testimony that S.O. preferred him to penetrate her vagina with a sex toy and his penis at the same time. There was some confusion as to whether the toy would be referenced in the State's case. However, the circuit court determined that, unless the State alleged that a toy was used during the rape, Van Der Weide could not proffer evidence of the same. Van Der Weide sought permission and was allowed to introduce into evidence several text messages between himself and S.O. around the time of the rape. The court then allowed the State, over Van Der Weide's objection, to cross examine him based on other texts surrounding the excerpted messages. Van Der Weide was found guilty and appeals, arguing that the court abused its discretion in excluding evidence of the sex toys and allowing the State to cross examine based on unadmitted text messages. We reverse.

-1-

## Factual and Procedural Background

[¶3.]      S.O. and Van Der Weide began living together in 2017.  At the time, S.O. was 18 and Van Der Weide was 20.  The next year, S.O. became pregnant and they got engaged.  A few months after the birth of their daughter, S.O. and Van Der Weide temporarily ended their relationship.  However, they got engaged once more in November 2020 and moved into an apartment together in Beresford, South Dakota.  Although they initially shared a bedroom, S.O. and Van Der Weide were sleeping in separate bedrooms by May 2021.  S.O. later testified that, in the month and a half leading up to June 13, they did not have consensual sex.

[¶4.]      Between June 10 and 13, 2021, Van Der Weide sent S.O. several sexually explicit text messages, expressing his desire to have sex with her.  She responded that Van Der Weide should find someone else to be intimate with and that she did not want to have sex with him.  S.O. also texted that she was packing up and planning to leave.  On the evening of June 12, the day before she was planning to leave the apartment, S.O. went out with some friends and spent the night with a coworker.  At 8:16 p.m. that day, she texted Van Der Weide that "[m]y stuff is packed and I'll be back in the am to get it."  S.O. returned to the apartment between 8:30 and 9:00 a.m. the next morning and ate some light breakfast on the couch.  S.O. also talked with her friend, A.H., over the phone.  According to A.H., this occurred sometime between 10:00 and 11:00 a.m. and S.O. "[s]eemed fine at that point."

[¶5.]      While S.O. was still on the couch, Van Der Weide sat beside her and, after some discussion, began kissing her.  According to S.O., even though she told

him to stop, Van Der Weide "tore (her) shorts off" and then digitally penetrated her anus as she was attempting to escape by crawling into the bedroom. Once they were in the bedroom, Van Der Weide pinned S.O. to the floor and, saying that he would "do anything to get this p***y," penetrated her vagina with his penis until he orgasmed. S.O. told police that, during the rape, she "scream[ed] no" and attempted to fight Van Der Weide off, including slapping him and biting one of his forearms.

[¶6.]        Afterwards, Van Der Weide went to take a shower. S.O. "threw on the closest pair of pants . . . got in [her] car and headed off to get [her] three-year-old daughter." While driving, S.O. called A.H.—A.H. testified that this call was ten minutes after their previous conversation—and told her about the rape. They met near the Centerville exit on the interstate out of Beresford. According to A.H., S.O. was distraught: "We stood outside and just I held her for a few minutes and let her cry it out[.]" A.H. then called 911 while S.O. contacted her mother and father. Sergeant Aaron Bartscher of the Lincoln County Sheriff's Office and Officer John Krebs of the Beresford Police Department responded to the call, meeting S.O., A.H., and S.O.'s parents at the interstate exit. Officer Krebs privately interviewed S.O., who told him that Van Der Weide had raped her through penile penetration of her vagina. At this time, she did not disclose the digital anal penetration.

[¶7.]        Officer Krebs and Sergeant Bartscher then drove to Van Der Weide's apartment to interview him about the incident. Sometime before they arrived, Van Der Weide received a text message from S.O., telling him "I'm on the phone with the cops. I told you to stop." However, when Officer Krebs confronted him in the apartment parking lot, Van Der Weide stated that he was "confused" and denied

that there had been "any type of incident" earlier that day. Van Der Weide willingly rode in Officer Krebs' car to continue the interview at the Beresford Police Department.

[¶8.] After obtaining background information, Officer Krebs asked Van Der Weide to recount what had happened that morning. Van Der Weide explained that he had been out the previous night with friends but returned to the apartment before S.O. When she arrived, he sat next to her on the couch, and they began to talk about their strained relationship. According to Van Der Weide, they eventually started "kissing and hugging," jointly removed her maternity shorts, and then began to have consensual "make-up" vaginal intercourse in the living room. Upon prompting from Officer Krebs, Van Der Weide clarified that, according to S.O.'s alleged preference, he had penetrated her from behind and pulled her hair. When asked if he had pushed S.O. to the ground and held her down, Van Der Weide responded that S.O. "likes it a little bit rough" but only admitted to pulling her hair and "bit[ing] her a** a little bit."

[¶9.] Van Der Weide told Officer Krebs that the sexual encounter started on the couch and later moved to the living room floor. He also explained that the sexual encounter had occurred primarily with S.O. face downwards—except for a brief period where he "rolled" her on her back—and that he had penetrated S.O.'s vagina with his penis and with "her toys" until he ejaculated. Van Der Weide maintained that he and S.O. regularly used sex toys during intercourse, and that she liked him to penetrate her vagina with a toy and his penis at the same time. He claimed that, while the intercourse occurred exclusively in the living room, he and

S.O. had gotten multiple sex toys from the bedroom. According to Van Der Weide, they both used a toy to penetrate her vagina.

[¶10.] Van Der Weide denied S.O. had ever told him no or to stop, although he allegedly recalled that she might have said "don't stop." He described the sex as "amazing" and claimed that he didn't understand S.O.'s messages about calling the police and having told him to stop. Van Der Weide also told Officer Krebs that, apart from the hair pulling and a** biting, there had not been any biting, scratching, hitting, fighting, or screaming. Van Der Weide showed Officer Krebs his arms and there were no visible bite marks or other physical injuries. When Officer Krebs accused him of feigning confusion when he was confronted earlier in the apartment parking lot—Officer Krebs pointed out that he must have known the police were coming—Van Der Weide responded that he "never would have thought she would try to get me for something like this."

[¶11.] Officer Krebs notified Van Der Weide that S.O. would soon be medically examined, revealing any potential damage to her private parts. Van Der Weide, however, suggested that signs of injury to S.O.'s vagina could be attributable to him penetrating her that morning with his penis and a sex toy simultaneously. Sergeant Bartscher, with Van Der Weide's consent, obtained DNA swab samples from his mouth. Van Der Weide also consented to the seizure of certain evidence, including S.O.'s shorts and the sex toys, from his apartment. He accompanied Officer Krebs back to his residence and S.O.'s shorts were found in her bedroom and the sex toys were located in a closet drawer. Van Der Weide identified two of the

toys as having been used in the sexual encounter. Officer Krebs took this evidence, along with Van Der Weide's shorts, and left the apartment.

[¶12.] S.O. underwent a sexual assault examination that same day at Mercy Medical Center in Sioux City. A sperm DNA profile obtained from the vaginal swab was later determined to match Van Der Weide's DNA sample. The next day, June 14, 2021, S.O. had a more extensive interview with Officer Krebs at the Beresford Police Department. During this interview, S.O. disclosed that Van Der Weide had previously "got[ten] physical with (her)" around April 2021. According to S.O., after that incident, they slept in separate bedrooms and were no longer in a romantic relationship. S.O. told Officer Krebs that, prior to the reported rape, she and Van Der Weide had not had sex for two months.

[¶13.] S.O. elaborated on the details of the rape that she had recounted to Officer Krebs the day before. In addition to her initial allegation of penile penetration, S.O. told Officer Krebs that Van Der Weide had also penetrated her anally and vaginally with his fingers while they were in the living room. When asked if any sex toys had been involved, S.O. denied that such objects had been used in any way during the assault. Nevertheless, after prompting, she disclosed that Van Der Weide had grabbed a sex toy from a drawer in her bedroom and that she had grabbed it away from him and thrown it at his face. S.O. also acknowledged that, during their prior consensual sexual activity, she and Van Der Weide would sometimes penetrate her vagina with his penis and a sex toy at the same time. S.O. nevertheless maintained that a sex toy had not been used to penetrate her during the rape.

[¶14.]     On September 1, Van Der Weide was charged with one count of second-degree rape in violation of SDCL 22-22-1(2) in that he "did accomplish an act of sexual penetration with [S.O.] through the use of force, coercion, or threats of immediate and great bodily harm to [S.O.], accompanied by apparent power of execution." He was arrested and released on bail.

[¶15.]     Before trial, Van Der Weide moved to admit evidence of S.O.'s other sexual behavior pursuant to SDCL 19-19-412(b)(1)(B) and (C). These provisions permit the admission of such evidence if 1) "exclusion would violate the defendant's constitutional rights," 2) the evidence is offered "by the defendant to prove consent," or 3) it is "offered by the prosecutor." Specifically, Van Der Weide sought to introduce testimony concerning S.O.'s alleged previous sexual preferences in the relationship including: consensual use of sex toys as directed by S.O., use of a sex toy in conjunction with Van Der Weide's penis during penetration, videotaping of sexual interactions, the use of certain sexual positions where Van Der Weide would penetrate S.O. from behind, and a "history of fighting and then making up with sex."

[¶16.]     At a pre-trial hearing on February 3, 2022, Van Der Weide stated that he only wanted to introduce general testimony concerning these matters, rather than any videos or pictures. As to the sex toys, the circuit court initially determined that, since a sex toy was not used to commit the alleged rape, "any relevance would be very minimal." When questioned, the State responded that it did not intend to present any evidence of the sex toys at trial. However, after a brief recess, the State

changed course and expressed an intent to present evidence "[t]hat he attempted to use one of the toys to penetrate her, and nothing - - one toy to penetrate her."

[¶17.] The court then ruled that "[t]he use of that sex toy or device during the scope of the rape allegations as it will be presented against the defendant does then become relevant. . . . I think whether the use of such devices was normal in their relationship is as far as any of that information can go." When questioned by Van Der Weide as to whether evidence of multiple toys could come in, the court clarified: "I've ruled one would be relevant, so just one. And I don't believe that's necessarily up to me. I think the State can present whatever evidence it deems appropriate putting on their case."

[¶18.] The court next considered the alleged past simultaneous use of a sex toy and penis during penetration. The court asked the State whether any such act was part of the alleged rape. The State responded that "[i]t is my understanding that that is how he attempted to use [the sex toy], so yes." On the basis of this information, the court ruled that "[i]f it is part of the allegations" then "[w]hether or not that has been previously a consensual encounter or action between the parties is relevant. Anything beyond that is not relevant and will not be admitted." The court then ruled that testimony concerning previous videotaping of sexual encounters was "highly prejudicial," "not directly relevant," and thus would not be admitted. The court also ruled that evidence of preferred sexual positions during the relationship was only admissible insofar as "it was normal for them to have consensual intercourse from behind."

[¶19.] Finally, Van Der Weide sought to introduce certain Snapchat messages to support his narrative that the encounter was merely "make up sex." Specifically, Van Der Weide argued that "going into what the fight was about is something that we'd argue is relevant to that issue of the, you know, what caused the make up sex in [the] argument for consent." The State responded that, while it would not object to testimony that Van Der Weide and S.O. had a fight the day before, any reference to potential sexual interactions between S.O. and a third party would be excluded by the rape shield statute, SDCL 19-19-412. The court ruled that, while "[t]he defendant can certainly indicate that there had been an argument," any testimony as to a sexual relationship with a third party would be excluded.

[¶20.] The State then pointed out that "there w[ere] some text messages that were sent that defense counsel indicated may be used in 412 that I don't think we've covered." This apparently referred to the sexually explicit text messages between Van Der Weide and S.O. in the days leading up to June 13, 2021. However, the court cautioned Van Der Weide that messages pertaining to "sex for money could lead to another criminal act." After a brief recess, Van Der Weide declined to offer the text messages as an exhibit: "I don't think I formally offered it and I wouldn't offer it today." As a result, the court did not rule on the admissibility of this evidence at the hearing.

[¶21.] A few days later, on February 9, 2022, Van Der Weide submitted a motion to admit evidence of the sex toys taken into evidence by Officer Krebs. Van Der Weide argued that, because a sex toy was apparently used during the alleged rape, the toys were part of the res gestae of the crime and relevant to show S.O.'s

consent. Although Van Der Weide acknowledged that the State was not currently planning to "introduc[e] the sex toys in any way, shape or form," he claimed that jurors needed to see the toys in order to understand their intended use and size. Van Der Weide moved to either admit the sex toys themselves, or at least pictures of the same.

[¶22.] On February 17, 2022, the court held another hearing to address this motion. Van Der Weide asserted that "[a]t [the previous] hearing, the State said in their case in chief, they're actually going to say [the sex toy] was used simultaneously with penis penetration." He maintained that the jury should be able to consider the objects "in determining whether consent was involved that day." The State objected that introducing the toys was merely an attempt to humiliate the victim with irrelevant evidence. Van Der Weide concluded by arguing that "[S.O.]'s alleging that the one - - the first two photos, the pink [toy], was used with penis penetration, so that will be a fact question for the jury to decide whether she - - whether that's believable[.]"

[¶23.] When questioned by the court, the State revealed that "[w]e intend on asking one question about . . . when she's crawling for the bedroom, I think it comes out that he attempted to grab one and then I believe she then threw it if I remember correctly." The court then sought clarification as to whether the State was planning to go "into any type of sexual assault or rape based upon the use of such objects[.]" When the State confirmed that they did not intend to bring forth such an allegation at trial, Van Der Weide asserted that, during the last hearing,

the State had suggested that the rape allegations included use of one of the sex toys.[1] The State responded:

> Our intent is to say that he penetrated her with his penis. That is the allegation of rape. Obviously he goes for the toy. My understanding is he attempts to penetrate her with the toy and his penis, but our allegation here is that he penetrated her with his penis. That was the act of rape.

[¶24.] The court noted that "it makes a difference on whether or not that's an object that was used to commit an assault or whether it was a[n] [immaterial] item the State doesn't intend on using to prove its case in chief." The State reiterated that "[i]t's our intention to say [he] penetrated her with his fingers and with his penis. . . . that's the allegation of rape." The court then reasoned that "[w]hether or not this sex object was used or not used does not directly determine whether or not the rape did or didn't happen." Because of the limited relevance and prejudicial nature of the objects, the court determined that showing the sex toys to the jury was not appropriate. Nevertheless, the court ultimately ruled that, if the State referenced the sex toy in its case-in-chief, Van Der Weide "should have an opportunity to at least cross-examine regarding the same." As to whether Van Der Weide could testify as to the second sex toy referenced in his version of events, the court declined to rule on the matter because "[t]hat's going to depend on how all the other testimony comes in prior to any such potential testimony by the defendant."

---

1. During the pretrial proceedings, the State's understanding of how the sex toy was used during the incident apparently changed. Initially, the State thought that Van Der Weide had attempted to penetrate S.O. with the toy during the rape. Later, however the State learned that S.O. alleged that Van Der Weide grabbed for the toy while they were in her bedroom and she took it away from him and threw it in his face.

[¶25.]     Immediately before trial, the court restated and clarified its ruling for both Van Der Weide and the State. The court explained that, while "[a]ny alleged victim sexual preference [was] not allowed," Van Der Weide could elicit testimony as to the previous consensual use of certain sexual positions and the sex toy, if these matters were part of the rape allegations put forward by the State. During its opening statement, the State told the jury that S.O. had been raped through digital and penile penetration. The State, however, did mention that S.O. would "talk about how she remembers slapping him, throwing things."

[¶26.]     During S.O.'s direct examination, she testified that Van Der Weide digitally penetrated her anus while she was crawling from the living room to her bedroom in an attempt to escape. S.O. also informed the jury that, once they were in the bedroom, Van Der Weide penetrated her vagina with his penis until he orgasmed. The State did not ask, and S.O. did not offer, whether she had thrown anything at Van Der Weide during the rape. Thus, there was no mention of or allusion to the sex toys during her direct examination. On cross examination, however, Van Der Weide had the following exchange with S.O.:

> Q: Did you reach for any type of weapon or anything?
>
> A: No.
>
> Q: Do anything to Keaton to try to get away from him?
>
> A: I remember that I tried to fight him and I slapped him. How hard I hit him, I couldn't even tell you.
>
> Q: Do you know if you told the officer that you did bite him and leave a mark?
>
> A: I did. I told him I bit him on the forearm.

Q: You thought there would be a mark?

A: I figured there would be a mark.

Q: Was there anything else you tried to do to get him - - away from him?

A: I slapped him. I kicked him.

Q: Did you grab for anything?

A: No.

Q: Did you tell the police you grabbed for something in the bedroom?

A: Nope. I didn't grab for anything.

[¶27.] Van Der Weide thought this conflicted with S.O.'s previous disclosure to Officer Krebs that she had thrown a sex toy during the rape. In an attempt to contradict S.O.'s testimony, Van Der Weide pursued the following line of questioning during cross-examination of Officer Krebs:

Q: Did Keaton explain why they were in the bedroom in his interview?

A: Did he explain why they were in the bedroom?

Q: Yes.

A: He said they went to the bedroom to get something was the only reason they went there.

Q: That there was something that they use consensually during sex?

At this point, the State asked to approach and a conference was held at the bench. Van Der Weide requested an opportunity to make a record outside the presence of the jury and the court indicated that he could do so after completing the cross-examination of Officer Krebs.

[¶28.] Once outside the presence of the jury, the court and counsel had the following excerpted exchange:

> COURT: I apologize. I don't believe I'm getting a consistent read. When you were up at the bench and you were asking to go down the line of questioning - - at that point in time, you indicated that you believed you could bring up the sex objects and sex toys. I advised that pursuant to my prior ruling based upon what the State needs to put forth before that would become relevant that that had not been done, so that wasn't relevant. So at that point when you were at the bench and we were in the middle of taking his cross-examination testimony, you wanted to introduce the sex toy - - or sex object. So that was why my ruling was at that point in time what it was. I can't go back and undo that because now you want to do that. Because now you want to - - just want to introduce it just for the credibility and don't want to mention sex toy, even though you said again, you think it would come up in his response.
>
> DEFENSE: When I responded at the bench, Your Honor, I said that it was a credibility issue for the reason that I want to bring it up based on the inconsistent statement.
>
> COURT: I understand that but not every inconsistent statement can come in based on that balancing of probative and prejudicial, especially with the 412 hearings that we've had and the rulings that I've made. I can understand why the defense thinks - - again, bringing that up would be relevant, may go to credibility, but I previously ruled more than once now that if that is not brought up in the State's case in chief and it's not an element that needs to be met, a reasonable doubt can go to the jury to find the defendant guilty - - it's not a material element - - then any probative value is highly outweighed by the prejudicial effect and I believe those items would fall under the rape shield law.

The court then discussed with both parties whether "just asking a question about credibility" would be proper impeachment given the surrounding context. After hearing arguments from both sides, the court concluded: "Whether or not she threw something at him is not ultimately a material issue either for what the jury needs

-14-

to determine, so I don't think probative value in any way is outweighed by [its] prejudicial effect."

[¶29.] The next morning, outside of the presence of the jury, Van Der Weide indicated he intended to testify and the court admonished him to refrain from mentioning topics that had been excluded by the court's prior orders. The State rested a short while later, and Van Der Weide took the witness stand. During his direct examination, he attempted to allude to the sex toys:

> Q: Okay. So did the penetration start in the living room?
>
> A: Yes.
>
> Q: Did she receive a phone call while you guys were - -
>
> A: Her phone started ringing shortly after we had started and that's when her phone started ringing. She said she needed to answer that. I told her - - or - - I told her that's fine. And then she told me to go to the bedroom and grab an undisclosed object.
>
> STATE: Objection, Your Honor.
>
> COURT: Sustained.
>
> A: And I did so. I got back. She was on the phone. It was probably a three- or four-minute call and then we continued.
>
> Q: Then you went into the bedroom?
>
> A: We went into the bedroom shortly after. It wasn't too much longer. I'd say four or five minutes.
>
> Q: After the - -
>
> A: Mainly just to grab - -
>
> STATE: Objection, Your Honor.
>
> COURT: Okay. Sustained. Mr. Van Der Weide, please remember the admonishment I gave you.

[¶30.]    After the conclusion of the testimony, the State moved for a mistrial on the basis of these references to the excluded sex toys. The court seemed inclined to grant the motion but, after a recess and consultation with the victim, the State withdrew its motion. The court again admonished Van Der Weide to avoid any discussion of the sex toy.

[¶31.]    Before his testimony, Van Der Weide also sought permission to introduce exhibits of certain redacted text exchanges between himself and S.O. that were sent in the days before and after the alleged rape. The exhibits included messages concerning their daughter and, in Exhibit D, a message from S.O. on June 13, telling Van Der Weide to "[s]tay away from [their child]." This was followed by another message on June 14, asking Van Der Weide, "Hey. You good?" The court determined that these messages did not include references to anything previously ruled inadmissible. However, the court cautioned that admitting these exhibits would open the door for the State to reference other text messages during cross-examination. Van Der Weide ultimately offered four such text exchanges as exhibits and testified as to the same during direct examination.

[¶32.]    During the recess following Van Der Weide's direct examination, the State sought permission to cross examine based on a "huge packet" of further redacted messages between Van Der Weide and S.O. Van Der Weide pointed out that these messages included a picture depicting bruises on S.O. and accused the State of "taking out several statements of . . . [S.O.]'s while leaving Keaton's which is misleading." The State explained that they were attempting to impeach Van Der Weide on his assertion that the relationship had ended because of his work travel:

"He knows that's not an accurate representation. . . . So I believe that those are relevant and could come in and the door was opened."

[¶33.]     The court ruled that, since the messages contained information not relevant to the rape allegation, the entire packet could not be admitted as evidence for the jury's consideration.[2]  However, the court also determined that Van Der Weide could be cross examined regarding why his relationship with S.O. had deteriorated.  On cross-examination, the State then confronted Van Der Weide regarding his sexually explicit exchanges with S.O. in the days leading up to the alleged rape.

[¶34.]     Following the presentation of evidence and closing arguments, Van Der Weide was found guilty of rape in the second degree and sentenced to 20 years in the state penitentiary, with ten suspended under certain terms and conditions. Van Der Weide raises two issues on appeal, which we restate as follows:

> 1.    Whether the circuit court erred in applying the rape shield statute to exclude evidence of the sex toys Van Der Weide claimed to have used during the sexual encounter.
>
> 2.    Whether the circuit court erred in permitting the State to cross examine Van Der Weide based on certain portions of text exchanges between himself and S.O.

**Standard of Review**

[¶35.]     We review issues of statutory interpretation de novo and evidentiary rulings for an abuse of discretion.  *See State v. Long Soldier*, 2023 S.D. 37, ¶ 11, 994 N.W.2d 212, 217; *State v. Little Long*, 2021 S.D. 38, ¶ 29, 962 N.W.2d 237, 249.  "An

---

2.    The "packet" of text messages is not included in the record and is therefore unavailable for our review.

abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *State v. Delehoy*, 2019 S.D. 30, ¶ 22, 929 N.W.2d 103, 109. "To establish reversible error with regards to an evidentiary ruling, a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice." *Little Long*, 2021 S.D. 38, ¶ 49, 962 N.W.2d at 255. Error is prejudicial when there is "a reasonable probability that, but for [the error], the result of the proceeding would have been different." *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686 (alteration in original).

## Analysis

> **1.** ***Whether the circuit court erred in applying the rape shield statute to exclude evidence of the sex toys Van Der Weide claimed to have used during the sexual encounter.***

[¶36.] The rape shield statute, SDCL 19-19-412(a)-(b)(1)(C), excludes evidence in sex offense cases of a victim's prior sexual history unless certain exceptions are met:

> a) **Prohibited uses.** The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:
> 1) Evidence offered to prove that a victim engaged in other sexual behavior; or
> 2) Evidence offered to prove a victim's sexual predisposition.
> b) **Exceptions.**
> 1) Criminal cases. The court may admit the following evidence in a criminal case:
> . . .
> > B. Evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant

-18-

to prove consent or if offered by the prosecutor; and

C. Evidence whose exclusion would violate the defendant's constitutional rights.

Van Der Weide argues that the circuit court misapplied the statute, turning it into "a sword wielded against Van Der Weide, proactively blocking him from admitting *related* sexual conduct to prove consent." Van Der Weide claims that, due to the circuit court's ruling, he "was barred from putting on his full defense, prevented entirely from confronting S.O.'s contradictory statements and attacking her credibility, as is his constitutional right[.]"

[¶37.] Van Der Weide argues that "he was not attempting to harass or embarrass S.O. with extraneous evidence, but to tell the jury what happened *during this encounter* to prove S.O. consented when she told him to get the sex toys." According to Van Der Weide, the circuit court "seem[ing]ly applied the Rape Shield Law to only allow evidence of the sex toys if the prosecution presented it." Van Der Weide asserts that the court's evidentiary rulings rested on an incorrect interpretation of SDCL 19-19-412 because "[t]he record below shows the circuit court essentially substituted the word '*or*' for the word '*and*' by permitting evidence of the sex toys only if it proved consent **and** only if the state presented it." The State responds that the circuit court properly excluded the toys because they were not relevant to the specific alleged acts of digital and penile penetration.

[¶38.] SDCL 19-19-412 establishes a presumption that evidence of the victim's other sexual acts or sexual predisposition is inadmissible in civil or criminal proceedings involving alleged sexual misconduct. This is to guard against unnecessary humiliation and the danger that such evidence will "inflame the jury so

that, feeling no empathy for [the victim], they may not have cared whether she was raped." *State v. Lykken*, 484 N.W.2d 869, 875 (S.D. 1992). Evidence covered by the rape shield statute must fall into one of the "narrow" statutory exceptions in order to be admissible under our rules of evidence. *State v. Malcolm*, 2023 S.D. 6, ¶ 32, 985 N.W.2d 732, 740. Van Der Weide is correct that, according to SDCL 19-19-412(b)(1), specific instances of the victim's sexual conduct with the accused are admissible to prove consent, whether they are offered by the prosecution or not. However, the SDCL 19-19-412(b)(1) exceptions are permissive, rather than mandatory: "The court *may admit* the following evidence in a criminal case." (Emphasis added). Thus, courts retain discretion to exclude proffered evidence in accordance with the other rules of evidence, including for lack of relevance or undue prejudice.

[¶39.] When offered to prove consent in a criminal trial, Rule 412 evidence must be relevant to the specific allegations of sexual assault at issue. In *State v. Woodfork*, this Court was asked to interpret SDCL 23A-22-15, the precursor to SDCL 19-19-412, and held that "[e]vidence of a rape victim's prior sexual encounters may be admitted if the trial court finds that it is relevant and material to a fact at issue in the case." 454 N.W.2d 332, 336 (S.D. 1990). In criminal cases, where specific prior instances of a victim's sexual behavior with the accused are introduced to prove consent, such evidence must be directly relevant to the sexual encounter where the alleged criminal misconduct occurred. For example, in *Lykken*, this Court held that evidence of past sexual interactions between the victim and the accused, including explicit photographs and a recording, were of minimal probative

value, and thus properly excluded, because they did not depict acts similar to what had occurred during the alleged rape. 484 N.W.2d at 874. Where such similarity is not present, the rape shield statue protects victims "from the humiliation of having their unrelated sexual conduct paraded before juries." *State v. Pugh*, 2002 S.D. 16, ¶ 13, 640 N.W.2d 79, 83.

[¶40.] Van Der Weide argues that this case is dissimilar to *Lykken* because he claims that two sex toys were used *during* the sexual encounter with S.O. At the hearing on February 17, 2022, Van Der Weide asserted that the rape allegations against him included simultaneous penetration with a sex toy and his penis. However, the State clarified: "My understanding is he attempts to penetrate her with the toy and his penis, but our allegation here is that he penetrated her with his penis. That was the act of rape." The circuit court highlighted that the actual penetration being alleged for rape "makes a difference" as to what is relevant for the defense of consent and ruled that Van Der Weide could respond if the sex toys were introduced first by the State as part of the evidence of the alleged rape.

[¶41.] According to Van Der Weide, this ruling misapplied the rape shield statute by making the admissibility of the sex toys contingent on whether they were first proffered by the State. As an initial matter, we note that in this case the testimony concerning the involvement of sex toys during the encounter necessarily implicates S.O.'s other sexual behavior and preferences. The mere existence of such items in S.O.'s bedroom brings her other sexual conduct under the scrutiny of the jury. Indeed, Van Der Weide maintains he should have been permitted to testify that he and S.O. commonly and consensually used sex toys during intercourse and

that this is what occurred during the alleged rape. Given this context, the sex toys fall into the presumptive prohibition of SDCL 19-19-412(a). The issue thus becomes whether these objects are admissible under one of the statutory exceptions.

[¶42.] To properly evaluate this question, we must first analyze the proffered evidence before the circuit court. After an extensive review of the record, we acknowledge that the court was faced with confusing, conflicting, and often ambiguous proffers from both parties as to what evidence and testimony would ultimately be presented at trial. The State changed its position several times on whether it would be eliciting testimony concerning the sex toy alleged to have been thrown by S.O. When pressed by the court, the State also equivocated as to how this toy was "used" during the assault. Van Der Weide, apparently based on his understanding that penetration with a sex toy would be part of the rape allegations, initially sought to introduce evidence that use of sex toys was common in the relationship. During the first Rule 412 hearing, Van Der Weide also told the court that S.O. had actually penetrated herself with a sex toy during the alleged rape.

[¶43.] In a subsequent motion, Van Der Weide then sought to introduce the physical sex toys as evidence of consent. At this juncture, he did not specify that S.O. had asked him to get any of the toys from the bedroom. At an additional Rule 412 hearing on this new motion, Van Der Weide argued that the sex toys were necessary for the jury to determine whether it was believable that he had penetrated S.O. with one of the objects and his penis at the same time. He also

expressed an intent to cross examine S.O. regarding the thrown sex toy.[3] The court

ruled that Van Der Weide could present evidence concerning the thrown toy if the

object was referenced in the State's case. When asked for clarification regarding

whether Van Der Weide could reference one or more of the toys during his

testimony, the court delayed its decision stating: "That's going to depend on how all

the other testimony comes in prior to any such potential testimony by the

defendant."

[¶44.]     At trial, after the State's case-in-chief, the court ruled that, since the

toys had not been introduced in any way by the State, Van Der Weide was not

permitted to mention the objects during his defense case. However, Van Der Weide,

on direct examination, attempted to allude to the sex toys: "[S.O.] told me to go to

the bedroom and grab an undisclosed object." The State's immediate objection was

sustained by the court. This was a crucial moment during the trial since Van Der

Weide, having waived his right to remain silent, was narrating the details of the

sexual encounter as he claimed to have perceived them. Indeed, for the reasons

---

3.     S.O.'s testimony regarding whether she grabbed for anything during the incident was relevant to her explanation of the assault. At trial she denied grabbing for anything. However, in her second police interview on June 14, 2021, S.O. told Officer Krebs that Van Der Weide grabbed for a sex toy and that she took it away from him and threw it in his face. Van Der Weide was entitled to impeach S.O.'s credibility on this point by asking either S.O. or Officer Krebs about any prior inconsistent statements S.O. had made because her testimony about the events in question is highly probative of her credibility. But at trial, Van Der Weide attempted to elicit testimony from Officer Krebs regarding his *own* statements to law enforcement describing his version of this event in an effort to impeach S.O. A party is not permitted to offer his own hearsay through another witness, unless the statement falls within an exception to the hearsay rule. *See* SDCL 19-19-801(d)(2) (an opposing party's statement is not hearsay only if it is "offered against" such party).

expressed below, this testimony presented a new, significant detail for the court to consider in its evolving SDCL 19-19-412 analysis.

[¶45.]     Returning to our discussion of admissibility, Van Der Weide is correct that, if the sex toys are viewed as evidence of consent, they would fall into an exception to the rape shield statute, regardless of whether they were introduced by the State.  Van Der Weide claims that, when their initial sexual encounter was interrupted by a phone call, S.O. told him to get a sex toy from the bedroom.  They then allegedly continued the sexual liaison, using two toys during the acts of penetration as, he claimed, was their common practice.  In the words of Van Der Weide: "His defense was that he understood S.O. consented because she told him to get the sex toys, as was normal for their sexual behavior together."

[¶46.]     However, it is important to note that when a defendant testifies in a sexual assault case, he or she is not automatically entitled to testify regarding *everything* that he or she claims was said or done during the sexual encounter at issue.  The circuit court must still fulfill its gatekeeping function and determine whether, in the exercise of its discretion, the evidence is properly admitted under the rules of evidence.[4]  That being said, Van Der Weide's testimony at trial

---

4.     For example, in *Stephens v. State*, the Indiana Supreme Court upheld application of the Indiana rape shield statute to preclude a defendant from recounting comments ostensibly made during the sexual encounter.  544 N.E.2d 137 (Ind. 1989).  The defendant claimed the victim had become angry during intercourse when he referenced her sexual preferences with other individuals.  *Id.* at 138.  The court noted that admitting such statements "would open the door for evading the statute entirely" since defendants would be able to bring in the sexual history of victims merely by claiming that something was said about these matters during the alleged sexual assault.  *Id.* at 139.  The Seventh Circuit denied habeas relief, noting that, although

(continued . . .)

regarding the sexual encounter was directly related to *how* S.O. allegedly consented. His narrative suggests that he knew S.O. consented because of her request for her sex toys, which would have mirrored their previous sexual history. This is comparable to *State v. Jones*, where the Supreme Court of Washington held that a trial court erred by excluding the defendant's testimony that the victim "consented to sex during an all-night drug-induced sex party." 230 P.3d 576, 580 (Wash. 2010) (en banc). Similarly, Van Der Weide's testimony at trial concerning the sex toys supported his defense that S.O. consented. We conclude that this evidence was probative of consent and thus admissible under SDCL 19-19-412(b)(1)(B).

[¶47.] Nevertheless, the circuit court still retained discretion to exclude or tailor Van Der Weide's testimony for prejudice under SDCL 19-19-403. Indeed, this appears to have been the court's understanding as well since it based its rulings not only on the rape shield statute, but also on a weighing of relevance and prejudice when it stated that "any probative value is highly outweighed by the prejudicial effect." We note that this is a misstatement of the SDCL 19-19-403 standard, which only allows the court to exclude evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." *See State v. Basker*, 468 N.W.2d 413, 415 n.1 (S.D. 1991) (noting prior misstatements of the balancing test).

---

(. . . continued)
> defendants have a constitutional right to testify in their defense, this right is "not unlimited and may bow to accommodate other legitimate interests in the criminal trial process." *Stephens v. Miller*, 13 F.3d 998, 1002 (7th Cir. 1994).

Regardless, we understand the court to have concluded that any relevance of the sex toys would be substantially outweighed by prejudice.

[¶48.]     As an initial matter, the sex toys could be viewed as highly prejudicial, given their tendency to bias and confuse the jury. The introduction of such items at trial may signal to the jury that the person in question is sexually promiscuous or engages in unusual sexual practices. It can also confuse the jury by focusing its attention away from the allegations at hand to ancillary and embarrassing matters.

[¶49.]     Here, however, the circuit court abused its discretion in not permitting Van Der Weide to testify regarding the sex toys. Through the morass of proffers, the circuit court was presented with three key "sex toy" assertions by Van Der Weide that were relevant to consent: 1) two sex toys were used during the sexual encounter; 2) S.O. used one of these objects to penetrate herself; and 3) the use of sex toys was common in their sexual relationship. At trial, Van Der Weide asserted another crucial fact: S.O., while answering a phone call, asked him to get one or more sex toys from her bedroom. Taken in context, this proffered testimony can only be viewed as highly probative because, if believed, it could establish that S.O. consented to the encounter. The probative value of this evidence, which was central to Van Der Weide's theory of consent, was not *substantially outweighed* by the danger of unfair prejudice.

[¶50.]     The circuit court, in this unique factual scenario, abused its discretion in misapplying both SDCL 19-19-412 and 19-19-403. The exceptions to SDCL 19-19-412 permit evidence of "specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant

to prove consent" and when the "exclusion would violate the defendant's constitutional rights." Yet the court absolutely prohibited Van Der Weide from eliciting any evidence concerning the alleged use of the sex toys in the June 13 encounter or during any prior consensual encounter, unless the use of sex toys was part of the rape allegations put forward by the State. By conditioning admissibility of this evidence on whether it was offered by the State, the court misapplied SDCL 19-19-412.

[¶51.] The circuit court seems to have concluded that the probative value of the proffered testimony turned solely on whether the State presented the sex toys as an element of the rape allegations. To be sure, the State's allegations in a criminal trial are relevant as to whether proffered evidence tends to prove or disprove the elements of the charged criminal conduct. However, in applying SDCL 19-19-403, the court failed to consider the probative value of the sex toy evidence in relation to Van Der Weide's claim that S.O. had consented. As a result, the court improperly precluded Van Der Weide from proffering this evidence regarding consent.

[¶52.] "[D]ue process is in essence the right of a fair opportunity to defend against the accusations. State evidentiary rules may not be applied mechanistically to defeat the ends of justice." *State v. Packed*, 2007 S.D. 75, ¶ 23, 736 N.W.2d 851, 859 (alteration in original). When "a trial court misapplies a rule of evidence, as opposed to merely allowing or refusing questionable evidence, it abuses its discretion." *Id.* ¶ 24 (quoting *State v. Guthrie*, 2001 S.D. 61, ¶ 30, 627 N.W.2d 401,

415).  The court abused its discretion in upholding the State's objection to Van Der Weide's attempted testimony.

[¶53.]        Normally, "[t]o establish reversible error with regards to an evidentiary ruling, 'a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice.'" *Little Long*, 2021 S.D. 38, ¶ 49, 962 N.W.2d at 255 (quoting *State v. Lassiter*, 2005 S.D. 8, ¶ 13, 692 N.W.2d 171, 175).  The issues presented here, however, directly implicate Van Der Weide's constitutional right to testify in his own defense.  *See Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 1045, 35 L. Ed. 2d 297 (1973).  Although this right "is not unlimited and may bow to accommodate other legitimate interests in the criminal trial process," we have already determined that Van Der Weide's testimony was not properly excluded under our rules of evidence.  *Miller*, 13 F.3d at 1002.  Thus, there is no sufficient stated interest present here to "balance[]" against Van Der Weide's right to testify. *Id.* at 1003.

[¶54.]        Where, as here, a defendant's right to present a defense has been unconstitutionally infringed, the burden shifts to the State to demonstrate "that the constitutional error was harmless beyond a reasonable doubt."  *State v. Taylor*, 2020 S.D. 48, ¶ 49, 948 N.W.2d 342, 356.  If this burden is not met, the defendant is entitled to a new trial.  *See id.*  On the record before us, we cannot conclude that preventing Van Der Weide from testifying regarding the sex toys was harmless beyond a reasonable doubt.  Fundamentally, this case turned on the jury's evaluation of the credibility of Van Der Weide and S.O.  By excluding Van Der

Weide's testimony, the circuit court prevented him from relating to the jury *how* S.O. allegedly consented to the sexual encounter by asking for the sex toys and why this was normal in their relationship. We cannot conclude that preventing the jury from weighing this important context was harmless beyond a reasonable doubt. Van Der Weide is thus entitled to a new trial. Because of this determination, we do not address the other issues presented by Van Der Weide.

### Conclusion

[¶55.]     The circuit court erred in excluding Van Der Weide's testimony regarding the sex toys, violating his constitutional right to testify in his defense. Because the error is not harmless beyond a reasonable doubt, Van Der Weide is entitled to a new trial. We reverse and remand for further proceedings consistent with this opinion.

[¶56.]     JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.